668 F.2d 389
 55 A.F.T.R.2d 85-635
 UNION ELECTRIC COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
and
W-3 Defense Group, Intervenor-Respondent,
and
Missouri Public Service Commission and Arkansas-Missouri
Power Company, Intervenor-Respondents.
W-3 DEFENSE GROUP, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
and
Arkansas-Missouri Power Company, Intervenor-Petitioner,
and
Union Electric Company, Intervenor-Respondent.
 Nos. 80-2086, 80-2108.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 16, 1981.
Decided Dec. 31, 1981.
 
 Kent M. Ragsdale, Steven Dottheim, Jefferson City, Mo., for Missouri Public Service Com'n intervenor-respondent.
 William E. Jaudes (argued), Paul A. Agathen, St. Louis, Mo., for Union Elec. Co.
 Charles F. Wheatley, Jr. (argued), Don Charles Uthus, James Howard, Peter A. Goldsmith, Wheatley & Wollesen, Washington, D. C., for W-3 Defense Group.
 Jerome Nelson, Acting Gen. Counsel, Joanne Leveque (argued), Joshua Z. Rokach (argued), Attys., for respondent Federal Energy Regulatory Comn.
 Before STEPHENSON, Circuit Judge, GIBSON, Senior Circuit Judge, and McMILLIAN, Circuit Judge.
 FLOYD R. GIBSON, Senior Circuit Judge.
 
 
 1
 This matter is before the court on petitions to review an order of the Federal Energy Regulatory Commission (FERC), granting in part a requested increase in wholesale electric rates. A group of wholesale customers of Union Electric (UE), called the W-3 Defense Group (WDG), was granted intervention. An administrative law judge (ALJ) issued an initial decision which granted UE a portion of the requested increase. Thereafter the FERC issued its order, Opinion No. 94, 12 F.E.R.C. (CCH) P 61,239 (1980), which had the net effect of reducing the rate increase approved by the ALJ. Both UE and WDG petition this court for review of the FERC order. We affirm the FERC's decision in its entirety.
 
 I. Standards and Scope of Review
 
 2
 To evaluate the challenges to the rates the FERC set, we first determine the appropriate scope of review and the burden of persuasion. Our duty is to see that the FERC has complied with the relevant sections of the United States Code. See Permian Basin Area Rate Cases, 390 U.S. 747, 791, 88 S.Ct. 1344, 1372, 20 L.Ed.2d 312 (1968); Federal Power Commission v. Natural Gas Pipeline Co., 315 U.S. 575, 586, 62 S.Ct. 736, 743, 86 L.Ed. 1037 (1942).[1]
 
 
 3
 Different sections may come into play depending on the issues, see, e.g., section II, infra, but the statute most frequently at issue will be the one declaring "any ... rate or charge that is not just and reasonable is hereby declared to be unlawful." 16 U.S.C. § 824d(a) (1976).[2] In determining whether a rate is just and reasonable, our scope of review of the FERC's factual findings is limited. According to statute, "(t)he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." Id. at § 825l (b). See Permian Basin, 390 U.S. at 791-92, 88 S.Ct. at 1372.
 
 
 4
 Beyond this limited factual inquiry, we need only be satisfied that the FERC's order, viewed in its entirety, produces no arbitrary result. Natural Gas Pipeline, 315 U.S. at 586, 62 S.Ct. at 743. Furthermore, "(u)nder the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling." Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 602, 64 S.Ct. 281, 287, 88 L.Ed. 333 (1944). To determine whether the result reached is just and reasonable, a reviewing court must decide "whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests ...." Permian Basin, 390 U.S. at 792, 88 S.Ct. at 1373. This does not mean that the reviewing court should supplant the FERC's balance of these interests with one more to its liking. Rather, the court need only "assure itself that the Commission has given reasoned consideration to each of the pertinent factors." Id.; see South Dakota Public Utilities Commission v. Federal Energy Regulatory Commission, 668 F.2d 333, 337 (8th Cir. en banc 1981). As enunciated in Permian Basin, 390 U.S. at 767, 88 S.Ct. at 1360:
 
 
 5
 A presumption of validity therefore attaches to each exercise of the Commission's expertise, and those who would overturn the Commission's judgment undertake "the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." FPC v. Hope Natural Gas Co., supra, (320 U.S.) at 602 (64 S.Ct. at 287). We are not obliged to examine each detail of the Commission's decision; if the "total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end." Ibid.
 
 
 6
 Moreover, this Court has often acknowledged that the Commission is not required by the Constitution or the Natural Gas Act to adopt as just and reasonable any particular rate level; rather, courts are without authority to set aside any rate selected by the Commission which is within a "zone of reasonableness." FPC v. Natural Gas Pipeline Co., 315 U.S. 575, 585, 62 S.Ct. 736, 742, 86 L.Ed. 1037.
 
 
 7
 The "zone of reasonableness" is wide. Tenneco Oil Co. v. Federal Energy Regulatory Commission, 571 F.2d 834, 840 (5th Cir. 1978), cert. dismissed, 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94.
 
 
 8
 Finally, as we apply the "just and reasonable" standard of review, we must remember that the burden of proof is on the challenger to a Commission order. The FERC's order is the product of expert judgment which carries a presumption of validity. Furthermore, the Supreme Court has said that the burden is a heavy one: "(H)e who would upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." Hope Natural Gas, 320 U.S. at 602, 64 S.Ct. at 287 (emphasis added). Therefore, if the challenger fails to produce evidence that a rate is not just and reasonable, the Commission should be affirmed even if it produces no evidence of justness or reasonableness.
 
 
 9
 In summary, we must review the Commission decision and decide whether it complies with the relevant statutes, including the one mandating a "just and reasonable" rate. If a challenge is based on a claim that the Commission incorrectly found the facts, we need only decide whether the findings are supported by substantial evidence. If a challenge otherwise alleges a lack of justness or reasonableness, we need to decide whether the order itself (rather than the method) is within a zone of reasonableness. The challenger has the heavy burden of showing convincingly that the order is outside the zone of reasonableness.
 
 
 10
 II. Union Electric's Tax Deduction for Interest
 
 
 11
 The first issue, raised by UE, is whether the FERC's computation of UE's interest is consistent with the Internal Revenue Code. The deduction is one of the elements used in determining the cost of service for ratemaking purposes.
 
 
 12
 The dispute centers on the FERC's treatment of the Accumulated Deferred Investment Tax Credit (ADITC). By enacting the tax credit, 26 U.S.C. §§ 38, 46, Congress sought to enable utilities to generate capital.[3] The ADITC fund is built by allowing the utility to pass on tax costs to ratepayers while the government actually collects only a portion of those taxes. The FERC included the ADITC fund in the rate base.
 
 
 13
 The presence of ADITC in the rate base affected the FERC staff's calculation of UE's tax deduction for interest. The staff tied UE's interest expense in part to its rate base.[4] This could overstate actual interest because the ADITC fund, unlike most capital in the rate base, is acquired interest-free. The higher the interest, the greater the tax deduction, the lower the income tax obligation, the lower the cost of service, the lower the rates. Therefore, both the utility and the ratepayers benefit from the credit; the utility receives cost-free capital and the ratepayers pay lower rates.
 
 
 14
 UE argues that the staff's method of computing interest violates the Internal Revenue Code because (1) the Code prohibits ratepayers from receiving as great a benefit from the ADITC as granted by the FERC, and (2) the Code allows the deduction only for actual interest. We must decide whether the FERC's method of calculating the interest is consistent with the investment tax credit statute.
 
 
 15
 According to 26 U.S.C. § 46(f)(2), a utility governed by that section, such as UE, will lose the credit if:
 
 
 16
 (T)he taxpayer's cost of service for ratemaking purposes or in its regulated books of account is reduced by more than a ratable portion of the credit allowable by section 38 (determined without regard to this subsection), or
 
 
 17
 ... the base to which the taxpayer's rate of return for ratemaking purposes is applied is reduced by reason of any portion of the credit allowable by section 38 (determined without regard to this subsection).
 
 
 18
 Under the FERC's method, interest is calculated "as if the entire rate base (including ADITC) were financed conventionally in the same proportions as the capital structure ...." Opinion No. 94, 12 F.E.R.C. (CCH) P 61,239 at 61,583 (1980). This approach was chosen to adhere to the "determined without regard to this subsection" requirement.
 
 
 19
 In determining whether the FERC's method complies with § 46(f), we first look to I.R.S. regulations. One such regulation permits a ratemaking agency to assign as the return on ADITC funds the "overall cost of capital rate (determined without regard to the credit.)" 26 C.F.R. Part 1, § 1.46-6(b)(3) (ii) (1980).[5] In other words, it allows ADITC to be treated like other capital. This regulation does not treat the earning by ADITC of the overall rate of return as a rate base adjustment, which would be prohibited by § 46(f) (2)(B). Public Service Co. of New Mexico v. Federal Energy Regulatory Commission, 653 F.2d 681, 688 (D.C.Cir.1981). We believe the FERC's action is consistent with the applicable I.R.S. regulations interpreting this complex statute. The District of Columbia Circuit has reached the same conclusion. Id. at 687.
 
 
 20
 We next must decide whether the I.R.S. regulation implementing § 46(f) is a correct statement of the law. When faced with a problem of statutory construction, courts should show great deference to the interpretation given the statute by the agency charged with its administration. Environmental Protection Agency v. National Crushed Stone Association, 449 U.S. 64, 83, 101 S.Ct. 295, 307, 66 L.Ed.2d 268 (1980). In particular, deference is to be accorded the I.R.S.: "Treasury Regulations 'must be sustained unless unreasonable and plainly inconsistent with the revenue statutes.' " Commissioner v. Portland Cement Co. of Utah, 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981), quoting Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). The reason such regulations command deference is that "Congress has delegated to the Secretary of the Treasury, not to this Court, the task 'of administering the tax laws of the Nation.' " Portland Cement, 450 U.S. at 169, 101 S.Ct. at 1045, quoting United States v. Cartwright, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). After an examination of the language and the legislative history of § 46(f), we cannot conclude that the regulation is unreasonable or inconsistent with the statute.
 
 
 21
 As explained above, both the utility and the ratepayers benefit from the credit under the FERC's method: the utility gets interest-free capital and the interest deduction leads to a lower cost of service and lower rates. Without such deductions, the ADITC would increase costs to ratepayers because the ADITC would swell the rate base on which ratepayers pay a return. The legislative history clearly shows that the customers are to receive a benefit from the credit. The House Report states: "(Y)our committee, in general, believes that it is appropriate to divide the benefits of the credit between the customers of the regulated industries and the investors in the regulated industries." H.R.Rep.No.533, 92nd Cong., 1st Sess., reprinted in (1971) U.S.Code Cong. and Ad.News 1825, 1839. Accord S.Rep.No.437, 92nd Cong., reprinted in id., at 1943. The FERC's method achieves this goal and is consistent with I.R.S. regulations; it allows a limited flow-through to consumers, and allows the remaining benefits to the investors or taxpayers, without requiring that all the benefits be allocated to the investors. In light of the deference we are obliged to give the regulations of the Secretary of the Treasury, we affirm the FERC's method of treatment of the ADITC. See Public Service Co. of New Mexico, 653 F.2d at 684-86, 689, 690.
 
 
 22
 UE argues this result is precluded by 26 U.S.C. § 163, which allows a deduction for interest actually "paid or accrued."[6] According to UE, § 163 will not permit UE to deduct the fiction interest calculated by the FERC. UE misunderstands the nature of FERC's action. The FERC was not attempting to reflect the actual tax consequences of the ADITC funds; rather, it was fixing UE's rate. The FERC's method is merely an attempt to distribute benefits of the credit between the utility and the taxpayers in accordance with the law.
 
 III. Rate of Return
 
 23
 UE also challenges the rate of return the FERC granted to it. Applying the standards and scope of review set out in section I, supra, this claim can be disposed of with relative ease.
 
 
 24
 The FERC granted UE a 13% rate of return. UE had recommended 16.09%. The FERC staff recommended 12.75%, WDG recommended 12.5% to 13%, and the ALJ felt that 13.5% was the proper rate. UE's objection is that the FERC granted UE a 13% rate of return solely because the FERC had granted a UE subsidiary (Missouri Utilities) a 13% rate of return in a proceeding five months earlier.
 
 
 25
 UE's attack appears to be aimed at the FERC's methodology, rather than the result. As mentioned above, one who challenges a rate must show that the result, and not the method employed, is unreasonable. Hope Natural Gas, 320 U.S. at 602, 64 S.Ct. at 287. The burden is on UE to show that 13% is an unreasonable rate. Id. UE has not presented this court with any evidence that the rate is unreasonable. Therefore we need not consider the propriety of tying UE's rate to Missouri Utilities' rate.
 
 
 26
 Furthermore, even if UE had presented evidence of unreasonableness, the FERC's adoption of the Missouri Utilities rate would be appropriate. First, the reasonableness of the FERC's rate is indicated by the fact that every rate recommendation other than UE's was close to the 13% adopted by the FERC. Second, there is substantial evidence in the record to show that UE and Missouri Utilities are similar. In fact, UE itself apparently believed it was substantially similar to Missouri Utilities; it had the same expert witness testify in both cases, and he used the same data base to conclude in both instances that the proper rate of return was 16.09%. Designated Record at 385. 12 F.E.R.C. (CCH) P 61,239 at 61,584 (1980). Also the WDG witnesses used the same analysis and came up with the same rate. Id. In light of these similarities, adopting the Missouri Utilities rate of return was supported by substantial evidence and was not unreasonable.
 
 IV. The Rate Base
 
 27
 WDG raises five objections to the FERC's order. The first three go to the FERC's determination of the rate base.
 
 A. Materials and Supplies Inventory
 
 28
 WDG objects to the FERC's treatment of routine materials and supplies inventory for maintenance. The FERC normally includes such inventory in the rate base. Materials for construction work in progress (CWIP) are usually not included in the rate base. Normally these items are capitalized and placed in the rate base when the work in progress is completed and becomes operational. WDG argues that a portion of the materials and supplies inventory was destined for construction work and therefore should not have been in the rate base. Materials for CWIP will earn a return after the construction work is completed, rather than when the materials are acquired. When materials from the routine inventory are earmarked for construction, they are included in CWIP for that project, and, of course, then deducted from the routine maintenance inventory.
 
 
 29
 The FERC's reasoning for allowing an inventory greater than necessary for maintenance is based on logistics. The FERC believes UE is entitled to a return on the cost of carrying materials and supplies for construction. A return on CWIP is possible only after materials and supplies are earmarked for a particular project. If the FERC reduced the amount for inventory based on an estimate of the amount of the inventory that would end up in construction, UE would not receive a return between the time the property was acquired and the time it was earmarked for a project. The FERC feels it would be unworkable to attempt to allocate the inventory to particular projects as soon as the materials are acquired. Instead, the FERC's method distributes the carrying cost of construction materials during that interim period among all of UE's customers.
 
 
 30
 We cannot say that it is unreasonable for the FERC to attempt to equitably distribute costs in this manner when there are substantial logistic obstacles to the most equitable distribution.
 
 B. Working Capital Allowance
 
 31
 WDG also objects to the FERC's allowing UE a 45-day working capital allowance. The FERC has established as a rule of thumb a 45-day capital allowance to be included in the rate base. Carolina Power & Light Company, Opinion No. 19-A, 17 Fed. Power Serv. 5-141, 5-142 (1979). The FERC will depart from the rule when a fully developed and reliable "lead-lag" study shows a more appropriate working capital allowance. Id. at 5-142-43. WDG argues that according to the FERC's staff witness, UE did not need any working capital allowance because UE receives revenues before it is obliged to pay corresponding expenses.
 
 
 32
 The FERC defends its rule of thumb principally on the basis that it produces reasonable results without expensive studies, prolonged litigation, or consumption of a great deal of the Commission's time. One estimate is that a lead-lag study costs $50,000 to $100,000. Id. at 5-142 n.4.
 
 
 33
 The FERC rejected the lead-lag study because the Commission did not find the study fully developed and reliable. We do not find this conclusion unreasonable. Even if this study definitively proved a 45-day allowance was not warranted, we would not be obliged to reverse the FERC. We are to look at the methodology. Hope Natural Gas, 320 U.S. at 602, 64 S.Ct. at 287. If the working capital allowance were eliminated, it would reduce the rate base by only 1.5%. Because the 45-day rule of thumb produces a small effect on the rate and the cost of a lead-lag study is so high, we cannot call the FERC's rule unreasonable.
 
 C. Deferred Income Tax Reserve
 
 34
 WDG's third rate base complaint is that the FERC should not have included in the rate base any part of a fund built from UE tax benefits. Beginning in 1976, the FERC allowed UE to charge customers for certain taxes as a cost of service, even though UE did not actually pay those taxes. This procedure was permitted by the FERC as a method of normalizing taxes, which would balance out over a period of years. This allowed UE to build a cost-free capital fund, usually designated as a deferred tax account. Normally no part of the fund could be included in the rate base. In this case, the FERC allowed UE to include in its rate base that part of the fund accumulated before the instant filing. This decision was based on the fact that WDG rates had not changed since 1975, and that those rates included as a cost of service only the taxes actually paid. UE did not use the tax normalization procedure until 1976. If none of the fund is included in the rate base, WDG would pay a return on a rate base which was diminished by contribution of other customers.
 
 
 35
 WDG takes issue with the FERC's conclusion that the 1975 rates assumed payment for actual taxes only (called a "flow-through" of tax reductions). Although the evidence can hardly be called conclusive, there was substantial evidence to support the FERC's conclusion. A settlement agreement disclaimed adoption of any particular ratemaking method. Designated Record at 4641. Before 1975, tax benefits had flowed through to the wholesale customers. Brief of Petitioner WDG in No. 80-2108 at 52. UE's witness testified that the settlement assumed flow-through. Designated Record at 2688. We conclude that this was substantial evidence to support the FERC's finding.
 
 
 36
 Given this finding, we can find nothing unreasonable or unjust about not reducing WDG's rate base because of funds contributed by other customers.
 
 V. Cancellation of Power Plant Construction
 
 37
 Another WDG objection is that UE should not be able to include in its cost of service the loss caused by cancelling construction of the Rush Island power plant.
 
 
 38
 The FERC was faced with the choice of having investors, ratepayers, or a combination of the two pay the cost of the cancellation. Under the FERC's decision, ratepayers will pay for the expenditures made; investors will not receive a return on their investment in the plant. The FERC made the decision as a rational compromise of ratepayer and investor interests. The FERC reasoned that its decision would not penalize UE for making a decision that appeared reasonable at the time, and thereby discourage construction of needed facilities. Putting all the risk of cancellation on investors would increase the cost of money for projects because a greater risk would demand a higher return.
 
 
 39
 Although contrary arguments could be made, the FERC decision is clearly a reasonable one. WDG suggests that the underlying assumption, that the initial decision to construct the plant was prudent when made, was never proved by UE or the FERC.
 
 
 40
 Because WDG did not present any evidence that the project was imprudent, the FERC did not have to make a specific showing of the project's prudence. Furthermore, the FERC did adopt the ALJ's opinion, which accepted UE's argument that the need for cancellation was brought about by changing conditions, which implies that had the changes not occurred, the project would have been prudent. Initial Decision of the Administrative Law Judge, at 34-35, Designated Record at 4408-09.
 
 VI. Tariff Provisions
 
 41
 WDG objects to the FERC's approval of three of UE's tariff provisions. The rules set a maximum capacity the utility will send through a delivery point, prohibit the customer from accepting power from another company under normal circumstances, and set a contract term of five years. WDG argues that these rules, individually and collectively, are anticompetitive because they make it harder for WDG to acquire and retail excess capacity and to acquire electric service from other sources.
 
 
 42
 WDG also objected to section 2 of UE's General Rules and Regulations, which required customers to notify UE of the maximum capacity they would need, leaving UE with the option of providing service beyond that need. The FERC agreed with WDG and disapproved of this rule, which the ALJ had approved.
 
 
 43
 UE defended the rules as reasonable before the ALJ. UE argued that the rules help it anticipate demand for electric service. This is particularly important in UE's capital intensive industry. If capacity substantially exceeds demand, all of UE's customers would have to pay the costs of any unneeded facilities. The ALJ accepted UE's argument, Initial Decision of the Administrative Law Judge, op. at 51-52, Designated Record at 4425-26, and the FERC affirmed the ALJ for the same reasons. Opinion No. 94, 12 F.E.R.C. (CCH) P 61,239 at 61,582 (1981).
 
 
 44
 UE's arguments were not unsupported, and it was reasonable for the FERC to approve the rules at issue, with the exception of section 2. Also the disapproval of section 2 of UE's General Rules and Regulations appears reasonable.
 
 VII. Conclusion
 
 45
 Having applied the substantial evidence test to the Commission's findings, and having found that all aspects of the Commission's final order were within the zone of reasonableness, we affirm the Commission's order.
 
 
 
 [1]
 These cases concerned the Natural Gas Act, 15 U.S.C. §§ 717-717w (1976), rather than the Federal Power Act, 16 U.S.C. §§ 791a-825r (1976), which is the subject of the instant case. However, the rate provisions of the two Acts are virtually identical, and therefore precedent from one is useful in construing the other. See Otter Tail Power Co. v. FERC, 583 F.2d 399, 405 n.26 (8th Cir. 1978)
 
 
 [2]
 This section actually refers to the Federal Power Commission. Functions of the Federal Power Commission have been transferred to the Federal Energy Regulatory Commission. 42 U.S.C. § 7172(a)(1)(B) (1977 Supp. I)
 
 
 [3]
 The investment tax credit was first established as part of the Revenue Act of 1962, Pub.L.No.87-837, 76 Stat. 960 (1962); the Internal Revenue Code provided that an eligible utility was granted a tax credit of three percent of the cost of qualifying new plant and equipment. The 1962 Act neither expressly nor impliedly specified or required any ratemaking treatment for a utility's tax savings resulting from its use of the investment tax credit. The Revenue Act of 1964, Pub.L.No.88-272, 78 Stat. 19 (1964), provided that, in respect to public utility property, no federal regulatory agency without the consent of the taxpayer could flow through the investment tax credit to income more rapidly than ratably over the useful life of the qualifying property
 The investment tax credit was suspended by the Revenue Act of 1966, Pub.L.No.89-610, 80 Stat. 855 (1966), and subsequently repealed by the Tax Reform Act of 1969, Pub.L.No.91-172, 83 Stat. 487 (1969). The Revenue Act of 1971, Pub.L.No.92-178, 85 Stat. 497 (1971), reestablished the investment tax credit with the name "job development investment tax credit."
 The Tax Reduction Act of 1975, Pub.L.No.94-12, 89 Stat. 27 (1975) and the Tax Reform Act of 1976, Pub.L.No.94-455, 90 Stat. 1520 (1976), temporarily increased the investment tax credit for utilities to the present limit of ten percent and temporarily increased the limit on the amount of the credit allowable in any given year. The ten percent credit rate and the increased dollar limitation were made permanent by the Revenue Act of 1978, Pub.L.No.95-600, 92 Stat. 2763 (1978). The Technical Corrections Bill of 1979, Pub.L.No.96-222, 94 Stat. 194 (1980), rectifies certain technical difficulties created by two 1978 tax statutes being signed in the wrong order.
 
 
 [4]
 The FERC calculated the interest expense deduction with the following equation:
 (prime interest rate X allocated notes payable) k (weighted cost of long-term debt X (allocated rate base k construction work in progress - notes payable) ).
 
 
 [5]
 In its entirety, § 1.46-6(b)(3)(ii) reads:
 In determining whether, or to what extent, a credit has been used to reduce rate base, reference shall be made to any accounting treatment that affects rate base. In addition, in those cases in which the rate of return is based on the taxpayer's cost of capital, reference shall be made to any accounting treatment that affects the permitted return on investment by treating the credit in any way other than as though it were capital supplied by common shareholders to which a "cost of capital" rate is assigned that is not less than the taxpayer's overall cost of capital rate (determined without regard to the credit). What is the overall cost of capital rate depends upon the practice of the regulatory body. Thus, for example, an overall cost of capital rate may be a rate determined on the basis of an average, or weighted average, of the costs of capital provided by common shareholders, preferred shareholders and creditors.
 
 
 [6]
 Section 163(a) reads: "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."