385 S.E.2d 451 (1989)
325 N.C. 463
STATE of North Carolina ex rel. UTILITIES COMMISSION; and Carolina Power and Light Company; Carolina Industrial Group for Fair Utility Rates; Carolina Utility Customers Association, Inc.; United States Department of Defense; Conservation Council of North Carolina; and Elizabeth Anne Cullington
v.
Lacy H. THORNBURG, Attorney General (Appellant).
No. 57A88.
Supreme Court of North Carolina.
November 9, 1989.
Lacy H. Thornburg, Atty. Gen. by Jo Anne Sanford, Sp. Deputy Atty. Gen., Karen E. Long and Lemuel W. Hinton, Asst. Attys. Gen., Raleigh, for State.
Richard E. Jones, Vice President and Gen. Counsel, Robert W. Kaylor and Robert S. Gillam, Associate Gen. Counsel, Raleigh, for Carolina Power and Light Co., appellee.
FRYE, Justice.
The questions presented on this appeal are: (1) whether the Commission erred as a matter of law by authorizing a utility to amortize cancellation costs as operating expenses for ratemaking purposes; and (2) whether the Commission's treatment of cancellation costs in prior orders is res judicata as to issue one. We answer both issues in the negative and affirm the Commission's order.

I.
This is an appeal from an order of the Commission in a general rate case involving Carolina Power and Light Company (CP & L). CP & L is a public utility organized and existing under the laws of North Carolina and is engaged in the business of developing, generating, transmitting, distributing, and selling electric power and energy to the general public within a broad area of North Carolina and South Carolina.
*452 Procedurally this case comes to this Court as follows:
On 6 January 1987 CP & L in Docket No. E-2, Sub 526 filed an application with the Commission for authority to adjust and increase electric rates and charges for certain of its North Carolina customers. The application sought the Commission's approval of rates that would produce approximately $173.4 million in additional annual revenues from CP & L's operations for an approximate 13.07% increase in total retail rates and charges. One of the principal reasons set forth in CP & L's application as necessitating the requested increase was the need to include in rates a portion of the costs associated with the abandoned construction of the Shearon Harris Nuclear Power Plant (Harris Plant).
On 11 March 1987 the Commission entered an order pursuant to N.C.G.S. § 62-137 declaring CP & L's application to be a general rate case, establishing the test period, scheduling public hearings, requiring the company to give public notice of its application and of the scheduled hearings, and requiring intervenors or other parties having an interest in the proceeding to file interventions, motions, or protests in accordance with applicable Commission rules and regulations.
Subsequently the United States Department of Defense, the Carolina Industrial Group for Fair Utility Rates, the Attorney General of North Carolina, the Conservation Council of North Carolina, Carolina Utility Customers Association, Inc., and Elizabeth Anne Cullington all filed Petitions or Notices of Intervention which were allowed by the Commission.
The case in chief came on for hearing before the Commission on 9 June 1987. On 5 August 1987, the Commission issued a Notice of Decision and Order which ordered that CP & L be allowed an opportunity to earn a rate of return of 10.45% on its investment used and useful in providing electric utility service in North Carolina. In order to have the opportunity to earn this rate of return, CP & L was authorized to adjust its electric rates and charges to produce an increase in gross revenues of $92,467,000 on an annual basis.
On 10 August 1987, CP & L filed proposed rates and charges to reflect the authorized increase. Upon examining CP & L's proposal, its application, the testimony and exhibits received into evidence at the hearings, the briefs submitted by the parties, and the entire record involved in this proceeding, the Commission on 27 August 1987 entered an Order Granting Partial Increase In Rates And Charges.[1] The Commission's order reviewed the history of the ratemaking treatment of the Harris Plant abandonment losses, noting:
The ratemaking treatment of the Harris abandonment losses has been considered by the Commission in previous general rate cases of CP & L. In Docket No. E-2, Sub 444, the Commission allowed a recovery of the cost associated with cancelled Harris Units 3 and 4 over a ten-year period with inclusion of the interest arising from the debt financing portion of the unamortized balance. In Docket No. E-2, Sub 461, the Commission reexamined the ratemaking treatment of abandonment losses in order to develop a more consistent and equitable approach. The Commission determined that CP & L should be allowed to continue amortization of the Harris abandonment losses, but that no ratemaking treatment should be allowed which would have the effect of allowing CP & L to earn a return on the unamortized balance. The Commission concluded that this treatment provided the most equitable allocation of the loss between the utility and its ratepayers. In CP & L's last general rate case, Docket No. E-2, Sub 481, the Commission dealt with CP & L's decision to cancel the construction of Harris Unit 2. Consistent with its treatment of the earlier Harris cancellations, the Commission ruled that the abandonment losses of Harris Unit 2 should be amortized over ten years with no return allowed on or with respect to the unamortized balance. *453 Consistent with these previous orders, CP & L proposes in this case to include in operating expenses the amortization of the three abandoned Harris units.
In this order the Commission reaffirmed its previous treatment of the Harris Plant abandonment losses allowing CP & L to continue to recover as operating expenses an amount reflecting an amortization of the cost of these abandoned units. The Attorney General now appeals from this order.

II.
On appeal the Attorney General presses two basic contentions. First, he argues the Commission erred by permitting CP & L to continue to include as an allowable expense for ratemaking purposes costs associated with the abandonment of the company's Harris Plant. Second, he argues the determination of the first contention is not barred by the doctrine of res judicata. We will address these arguments in reverse order.[2]

A.
The Attorney General contends on this appeal that the Commission's prior treatments of the cancellation costs of the Harris Plant, allowing the amortization of these costs as operating expenses in the ratemaking formula, are not res judicata on this issue. The Attorney General argues that since the ratemaking activities of the Commission are a legislative function, rather than a judicial function, Commission actions cannot be res judicata. CP & L counters, claiming the issue of amortization of Harris Plant cancellation costs has already been determined, and, therefore, the Attorney General's position is barred by the doctrine of res judicata. CP & L explains:
[T]he issue of how the costs of Harris Unit Nos. 2-4 should be treated for ratemaking purposes is not new. The Commission held in Sub 444, and reaffirmed in Sub 461, that CP & L is entitled to amortize the costs of Unit Nos. 3 and 4. It held in Sub 481 that the Company is entitled to amortize the costs of Unit No. 2. These rulings resolved the issue once and for all; the Attorney General did not appeal from any of them, and they are binding on him under the doctrine of res judicata.
CP & L relies essentially on this Court's decision in State ex rel Utilities Commission v. Public Staff, 322 N.C. 689, 370 S.E.2d 567 (1988) (hereinafter Duke 1988) as support for its position. We agree with the Attorney General's position on this issue.
As we recently noted in Duke 1988:
The doctrine of res judicata treats a final judgment as the full measure of relief to be accorded between the same parties on the same "claim" or "cause of action." C. Wright [A. Miller & E. Cooper], Federal Practice and Procedure, § 4402 (1969). "The essential elements of res judicata are: (1) a final judgment *454 on the merits in an earlier suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits." Hogan v. Cone Mills Corporation, 315 N.C. 127, 135, 337 S.E.2d 477, 482 (1985).
Duke 1988, 322 N.C. at 692, 370 S.E.2d at 569; see e.g., In re Trucking Co., 285 N.C. 552, 560, 206 S.E.2d 172, 177-78 (1974). More specifically, in addressing the issue of whether a Commission order can be deemed res judicata this Court has held that "only specific questions actually heard and finally determined by the Commission in its judicial character are res judicata, and then only as to the parties to the hearing." Utilities Commission v. Area Development, Inc., 257 N.C. 560, 570, 126 S.E.2d 325, 333 (1962) (emphasis added). Moreover, this Court has stated that ratemaking activities of the Commission are a legislative function. Utilities Comm. v. Edmisten, Attorney General, 294 N.C. 598, 603, 242 S.E.2d 862, 866 (1978); Utilities Commission v. General Telephone Company, 281 N.C. 318, 336, 189 S.E.2d 705, 717 (1972). It follows that since the exercise of the Commission's ratemaking power is a legislative rather than a judicial function, such orders are not governed by the principles of res judicata and are reviewable by this Court in later appeals of closely related matters. See Utilities Comm. v. Edmisten, Attorney General, 294 N.C. at 603, 242 S.E.2d at 866 (Commission's exercise of rule-making power is legislative and therefore not governed by res judicata).
With these principles in mind we hold that the Attorney General's position is not barred by the doctrine of res judicata. The prior Commission rulings relied upon by CP & L as a bar to the Attorney General's position were all designated by the Commission as "general rate cases" in which CP & L sought Commission authority to increase its electric rates and charges. Carolina Power & Light Co., Docket No. E-2, Sub 481, 74 N.C.U.C. 198 (1984); Carolina Power & Light Co., Docket No. E-2, Sub 461, 73 N.C.U.C. 183 (1983); Carolina Power & Light Co., Docket No. E-2, Sub 444, 72 N.C.U.C. 133 (1982). In each of these prior orders, as in the order now before us, the Commission authorized the recovery and amortization of the cancelled Harris Plant costs through the rate fixing requirements set out in N.C.G.S. § 62-133. In fixing rates to be charged by CP & L, the Commission was exercising a function delegated to it by the legislative branch of government. Utilities Comm. v. Telephone Co., 281 N.C. at 336, 189 S.E.2d at 717. This exercise of the Commission's ratemaking power is not governed by the principles of res judicata. Utilities Comm. v. Edmisten, Attorney General, 294 N.C. at 603, 242 S.E.2d at 866.
CP & L's reliance on our decision in Duke 1988 is misplaced. In Duke 1988 we addressed the Attorney General's contention that the Commission erred in reaffirming its earlier decisions to allow Duke Power Company (Duke) to recover from its ratepayers costs incurred in its previously cancelled nuclear power station projects. Duke 1988, 322 N.C. at 691, 370 S.E.2d at 569. We agreed with appellee Duke that our earlier decision in State ex rel. Utilities Comm. v. Eddleman, 320 N.C. 344, 358 S.E.2d 339 (1987), constituted res judicata as to the issue of whether Duke could amortize the costs of these plants and the Attorney General was therefore barred from pressing this contention. Duke 1988, 322 N.C. at 691, 370 S.E.2d at 569.
In Eddleman for the first time we considered whether the Commission had improperly allowed Duke to recover costs incurred in the construction of its abandoned nuclear power stations. Eddleman, 320 N.C. at 350, 358 S.E.2d at 345. Duke sought to recover from its ratepayers costs incurred in the construction of these plants, amortized over a period of years. Id. at 347, 358 S.E.2d at 343. The Commission, as it had done in the past without challenge on appeal, decided to permit this procedure. Id. at 348, 358 S.E.2d at 344. The Attorney General and other parties appealed to this Court, contending for various reasons that the Commission's decision was legally impermissible. Id. at 350, 358 S.E.2d at 345. This Court, one Justice not participating, *455 affirmed the Commission's decision by an evenly divided vote. Id. at 386, 358 S.E.2d at 365.
Concluding in Duke 1988 that our decision in Eddleman was res judicata on the plant abandonment issue we stated:
While our decision in Eddleman to affirm the Commission has no precedential value [as a result of the evenly divided vote], it does finally determine the rights of the parties in that litigation on the abandoned plant cost issue. Since those parties and that issue are the same as in the instant case, those parties may not here relitigate that issue.
Duke 1988, 322 N.C. at 693, 370 S.E.2d at 570.
CP & L now claims in this proceeding that our decision in Duke 1988 is "precisely analogous" to the case before us with one insignificant exception and therefore res judicata should apply. The one exception is "the fact that in Duke 1988 the previous case had become final by reason of an appeal to this Court which resulted in an affirmance by an equally divided vote having no precedential value, whereas in the case now before the Court the Sub 444, Sub 461 and Sub 481 rulings were not appealed on the cancellation costs issue and became final by virtue of the passage of time...." Contrary to CP & L's position, we find that this one exception distinguishes the instant case from Duke 1988. In Duke 1988 it was the judgment of this Court which was given res judicata effect, not a prior Commission decision. It is well established that "[w]here an administrative determination has been reviewed by the courts, the res judicata effect, if any, attaches to the court's judgment rather than to the administrative decision." 2 Am.Jur.2d Administrative Law § 499 (1962). This Court has not previously affirmed the Commission's decision in CP & L's rate cases allowing the inclusion of cancelled Harris Plant costs in rates. Here, therefore, there is no judgment to which res judicata can attach. For this reason, our decision in Duke 1988 does not support CP & L's contention that the position taken here by the Attorney General is barred by res judicata.
We hold that on this record the Commission's treatment of cancellation costs in prior orders is not res judicata in this proceeding.

B.
The Attorney General's main contention in this appeal is that North Carolina law does not allow recovery by CP & L, or any utility, of its investment in generating facilities which were cancelled prior to completion and operation. The Attorney General summarizes his argument by stating:
The plain language of N.C.G.S. § 62-133(c)the "operating expense" subsectionas well as cases interpreting it, make it clear that in North Carolina there must be a nexus between allowable operating expenses/revenues and property used and useful in providing service during the test year. Cancelled nuclear units are property which will never be used and useful in providing electrical service. Therefore, the investment in them does not qualify for inclusion in rate base and is equally unqualified for treatment as the source of an operating expense. Finally, any change in the regulatory scheme to authorize charges for cancelled plant to ratepayers may only be accomplished by the General Assembly.
The Attorney General also contends that both analogous decisions from other jurisdictions and public policy support his position. CP & L counters, claiming the language of N.C.G.S. § 62-133 does not prohibit amortization of cancellation costs and such amortization is supported by the state's utility policy, as declared by the General Assembly, and by universally accepted princples of statutory construction. CP & L also claims that its position on this issue is supported by the overwhelming weight of authority in other states and by most academic commentators. We agree with CP & L's position on this issue.
The question we must decide is not one of constitutional proportions, but one of statutory construction. The United States Supreme Court has clearly held that a state scheme of utility regulation does *456 not "take" the utility's property in violation of the fifth and fourteenth amendments simply because it disallows recovery of capital investment in cancelled plant not "used and useful in service to the public," even though the expenditures were prudent and reasonable when made. Duquesne Light Co. v. Barasch, 488 U.S. ___, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989). The question is whether the North Carolina statutes authorize the Commission to permit a utility to recover capital invested in cancelled plant by amortizing such costs as "reasonable operating expenses" under N.C.G.S. § 62-133(b)(3) without allowing a return on any part of the cancellation costs.
The scope of appellate review of a decision by the Commission is set out in N.C. G.S. § 62-94. Under this standard, the reviewing court
shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court may affirm or reverse the decision of the Commission, declare the same null and void, or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:
(1) In violation of constitutional provisions, or
(2) In excess of statutory authority or jurisdiction of the Commission, or
(3) Made upon unlawful proceedings, or
(4) Affected by other errors of law, or
(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted, or
(6) Arbitrary or capricious.
(c) In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party and due account shall be taken of the rule of prejudicial error.
N.C.G.S. § 62-94(b)-(c) (1982 Repl.Vol.). As this Court has often stated, our "statutory function is to assess whether the Commission's order is affected by errors of law, and to determine whether there is substantial evidence, in view of the entire record, to support the position adopted." State ex rel. Utilities Comm. v. N.C. Natural Gas Corp., 323 N.C. 630, 639, 375 S.E.2d 147, 152 (1989); accord State ex rel. Utilities Comm. v. Public Staff, 323 N.C. 481, 489, 374 S.E.2d 361, 365-66 (1988); State ex rel. Utilities Comm. v. Carolina Utility Customers Assoc., 323 N.C. 238, 243-44, 372 S.E.2d 692, 695 (1988); State ex rel. Utilities Comm. v. Eddleman, 320 N.C. at 355, 358 S.E.2d at 347; State ex rel. Utilities Comm. v. Thornburg, Atty. Gen., 316 N.C. 238, 242, 342 S.E.2d 28, 31-32 (1986); State ex rel. Utilities Commission v. Carolina Utilities Customers Assoc., 314 N.C. 171, 179-80, 333 S.E.2d 259, 265 (1985).
For a proper understanding of the parties' contentions on this issue, it is necessary to set forth the provisions of N.C.G.S. § 62-133(a) through (d) in their entirety:
(a) In fixing the rates for any public utility subject to the provisions of this Chapter, other than bus companies, motor carriers and certain water and sewer utilities, the Commission shall fix such rates as shall be fair both to the public utilities and to the consumer.
(b) In fixing such rates, the Commission shall:
(1) Ascertain the reasonable original cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within the State, less that portion of the cost which has been consumed by previous use recovered by depreciation expense plus the reasonable original cost of investment in plant under construction (construction work in progress). In ascertaining the cost of the public utility's property, construction work in progress as of the effective date of this subsection shall be excluded until such plant comes into service but reasonable and prudent expenditures for construction work in progress after the effective date of this subsection may be *457 included, to the extent the Commission considers such inclusion in the public interest and necessary to the financial stability of the utility in question, subject to the provisions of subparagraph (b)(4a) of this section.
(2) Estimate such public utility's revenue under the present and proposed rates.
(3) Ascertain such public utility's reasonable operating expenses, including actual investment currently consumed through reasonable actual depreciation.
(4) Fix such rate of return on the cost of the property ascertained pursuant to subdivision (1) as will enable the public utility by sound management to produce a fair return for its shareholders, considering changing economic conditions and other factors, as they then exist, to maintain its facilities and services in accordance with the reasonable requirements of its customers in the territory covered by its franchise, and to compete in the market for capital funds on terms which are reasonable and which are fair to its customers and to its existing investors.
(4a) Require each public utility to discontinue capitalization of the composite carrying cost of capital funds used to finance construction (allowance for funds) on the construction work in progress included in its rate based upon the effective date of the first and each subsequent general rate order issued with respect to it after the effective date of this subsection; allowance for funds may be capitalized with respect to expenditures for construction work in progress not included in the utility's property upon which the rates were fixed. In determining net operating income for return, the Commission shall not include any capitalized allowance for funds used during construction on the construction work in progress included in the utility's rate base.
(5) Fix such rates to be charged by the public utility as will earn in addition to reasonable operating expenses ascertained pursuant to subdivision (3) of this subsection the rate of return fixed pursuant to subdivisions (4) and (4a) on the cost of the public utility's property ascertained pursuant to subdivision (1).
(c) The original cost of the public utility's property, including its construction work in progress, shall be determined as of the end of the test period used in the hearing and the probable future revenues and expenses shall be based on the plant and equipment in operation at that time. The test period shall consist of 12 months' historical operating experience prior to the date the rates are proposed to become effective, but the Commission shall consider such relevant, material and competent evidence as may be offered by any party to the proceeding tending to show actual changes in costs, revenues or the cost of the public utility's property used and useful, or to be used and useful within a reasonable time after the test period, in providing the service rendered to the public within this State, including its construction work in progress, which is based upon circumstances and events occurring up to the time the hearing is closed.
(d) The Commission shall consider all other material facts of record that will enable it to determine what are reasonable and just rates.
N.C.G.S. § 62-133(a)-(d) (1982 Repl.Vol. & Cum.Supp.1988).
Our statutory scheme of utility regulation does not contain a definition of "reasonable operating expenses" as that term is used in N.C.G.S. § 62-133(b)(3). It does not expressly permit or prohibit the inclusion of cancellation costs associated with abandoned plant in the calculation of reasonable operating expenses. Thus, interpretation and analysis of the statutory regulatory scheme is necessary in order to determine if the Commission has exceeded its authority in allowing the recovery of such costs through amortization as a reasonable operating expense.
Our statute provides that "the Commission shall fix such rates as shall be fair both to the public utilities and to the consumer," N.C.G.S. § 62-133(a), and, in fixing such rates, the Commission shall: "(5) Fix such rates to be charged by the public *458 utility as will earn in addition to reasonable operating expenses ascertained pursuant to subdivision (3) of this subsection the rate of return fixed pursuant to subdivisions (4) and (4a) on the cost of the public utility's property ascertained pursuant to subdivision (1)." N.C.G.S. § 62-133(b)(5) (Cum. Supp.1988). While this statute makes clear that the rates to be charged by the public utility allow a return on the cost of the utility's property which is used and useful within the meaning of N.C.G.S. § 62-133(b)(1), the statute permits recovery but no return on the reasonable operating expenses ascertained pursuant to subdivision (3). The real question in this appeal is whether the utility may be permitted to recover all or any part of the cancellation costs from the ratepayers through the operating expense category or whether the entire cancellation costs must be borne by the stockholders.
In interpreting N.C.G.S. § 62-133 in prior decisions we have noted:
Certain fundamental legal principles are applicable and must be adhered to in applying the statute.... We begin with the proposition that the Commission is vested with the power to regulate the rates charged by utilities. The General Assembly has delegated to the Commission, and not to the courts, the duty and power to establish rates for public utilities. The rates fixed by the Commission must be just and reasonable. Rates fixed by the Commission are deemed prima facie just and reasonable.
The burden of showing the impropriety of rates established by the Commission lies with the party alleging such error. The rate order of the Commission will be affirmed if upon consideration of the whole record we find that the Commission's decision is not affected by error of law and the facts found by the Commission are supported by competent, material and substantial evidence, taking into account any contradictory evidence or evidence from which conflicting inferences could be drawn.
Utilities Commission v. Duke Power Co., 305 N.C. 1, 10, 287 S.E.2d 786, 791-92 (1982) (citations omitted); see e.g., State ex rel. Utilities Comm. v. Public Staff, 323 N.C. at 491, 374 S.E.2d at 366.
With these statutory provisions and principles in mind we hold that the Commission's order does not err as a matter of law in authorizing CP & L to continue to recover a portion of the cancellation costs of the abandoned Harris Plant as operating expenses through amortization. The Commission's determination was supported by several findings and conclusions. First, the Commission found that although "[t]his case must of course be decided on the basis of North Carolina statutes" the "majority of courts and commissions that have dealt with this issue have allowed ratemaking treatment of abandonment losses, usually as operating expenses." Second, the Commission concluded "that a liberal interpretation of the operating expense element of ratemaking so as to include the Harris abandonment losses is appropriate herein."[3] Last, the Commission found further support for its conclusion was provided by N.C.G.S. § 62-133(d), which allows the Commission to consider all material facts in the record in determining rates.
The Attorney General's contrary position on this issue must fail. First, we disagree with the Attorney General's contention that "[t]he plain language of G.S. § 62-133(c)... as well as cases interpreting it, make it clear that in North Carolina there must be a nexus between allowable operating expenses... and property used and useful in providing service during the test year." The Commission's conclusion rejecting this argument is not erroneous as a matter of law. We believe the plain language of N.C.G.S. § 62-133(c) merely provides that the components of the ratemaking formula are to be determined based on a historical test period. See N.C.G.S. § 62-133(c). *459 This provision does not require a nexus between operating expenses and "property used and useful." Id. The statute reserves this requirement solely to the reasonable original cost of the public utility's property, the ratebase component which is described in N.C.G.S. § 62-133(b)(1). In contrast, the statute's description of operating expenses in N.C.G.S. § 62-133(b)(3) simply provides that these expenses must be "reasonable." As the Commission's order points out, "[m]any reasonable operating expenses cannot be tied to specific utility property." Examples include the costs of planning and forecasting, research and development, tort claims, and the salaries of administrative employees. See 64 Am. Jur.2d, Public Utilities § 173 (1972).
In Utilities Comm. v. Edmisten, Attorney General, 294 N.C. at 606-07, 242 S.E.2d at 868, this Court considered the scope of the operating expense component of the ratemaking formula. In that decision we allowed certain natural gas distribution companies to include approved exploration costs in the operating expenses they passed on to ratepayers. Id. We stated:
When a narrow construction of the operating expense element of a regulatory act would frustrate the purposes of the act ... the term should be liberally interpreted and applied.... [O]ne of the primary policies set out in [the legislature's explanation of its objectives in N.C.G.S. § 62-2] is to promote adequate utility services....
Id. N.C.G.S. § 62-2, entitled "Declaration of policy," provides, in part:
Upon investigation, it has been determined that the rates, services and operations of public utilities as defined herein, are affected with the public interest and that the availability of an adequate and reliable supply of electric power and natural gas to the people, economy and government of North Carolina is a matter of public policy. It is hereby declared to be the policy of the State of North Carolina:
....
(3) To promote adequate, reliable and economical utility service to all of the citizens and residents of the State....
In the instant case, both the construction and the cancellation of the Harris Plant were approved by the Commission and the Attorney General does not in this proceeding dispute the validity of this approval. The recovery of these costs through a liberal interpretation of the operating expense component is, like the recovery of exploration costs in Edmisten, consistent with the act's purpose as set forth in N.C.G.S. § 62-2.
Finally, the Commission's rejection of the Attorney General's strict interpretation of allowable operating expenses is also supported by the language of N.C.G.S. § 62-133(d). As the Commission's order correctly notes, all sections of N.C.G.S. § 62-133 must be given weight in construing the language of any individual section. See Utilities Commission v. Duke Power Co., 305 N.C. at 18, 287 S.E.2d at 796. N.C.G.S. § 62-133(d) has been interpreted by this Court as allowing the Commission to consider "all other material facts of record" beyond those specifically set forth in the statute. See Utilities Commission v. Duke Power Co., 305 N.C. at 18, 287 S.E.2d at 796. Therefore, even assuming arguendo that the Attorney General's interpretation of N.C.G.S. § 62-133(c) is correct, the Commission would not be bound by a strict interpretation of the operating expense component.
On this record the Commission's decision to allow the recovery of Harris Plant cancellation costs through the operating expense component was within the Commission's power and was supported by competent, material, and substantial evidence. This Court is therefore without authority to disturb that decision. See e.g., State ex rel. Utilities Comm. v. Public Staff, 323 N.C. at 491, 374 S.E.2d at 366.
Second, we disagree with the Attorney General's contention that analogous cases from other jurisdictions support his position. The Commission's order correctly points out "that the majority of courts and commissions that have dealt with this issue *460 have allowed ratemaking treatment of abandonment losses, usually as operating expenses."[4] The Attorney General relies essentially on Office of Consumers' Counsel v. Public Utilities Commission, 67 Ohio St.2d 153, 423 N.E.2d 820 (1981), appeal dismissed sub nom., Cleveland Illuminating Co. v. Office of Consumers' Counsel, 455 U.S. 914, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982). In Consumers' Counsel, the Ohio Supreme Court held that costs associated with abandoned plants could not be considered operating expenses. Consumers' Counsel, 67 Ohio St.2d at 166, 423 N.E.2d at 828. This decision, however, is clearly distinguishable from the case before us. The Ohio statute involved provides as follows:
(A) The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges shall determine:
....
(4) The cost to the utility of rendering the public utility service for the test period....
Ohio Rev.Code Ann. § 4909.15(A)(4) (Anderson 1977).
In Consumers' Counsel, the Ohio Supreme Court relied on the fact that the definition of operating expenses in the Ohio statute is explicitly tied to costs associated with service provided by the utility during the test period. Consumers' Counsel, 67 Ohio St.2d at 163, 423 N.E.2d at 827; Ohio Rev.Code Ann. § 4909.15(A)(4) (Anderson 1977). As noted above, there is no such explicit connection in our ratemaking statute.
Last, we disagree with the Attorney General's contention "that strong policy considerations support the disallowance of [cancellation] expenses." We note that jurisdictions have generally dealt with the allocation of cancelled plant costs in one of the following three ways:
(1) recovery of all of the costs from ratepayers, by allowing amortization of the investment plus a return on the unamortized balance;
(2) recovery of all costs from shareholders through a total disallowance of recovery in rates, instead requiring the utility to write off the entire amount in a single year; or
(3) recovery from ratepayers and shareholders through amortization of costs in rates over a period of years, with no return on the unamortized balance.
See P. Rodgers & C. P. Gray, State Commission Treatment of Nuclear Plant Cancellation Costs, 13 Hofstra L.Rev. 443, 450-51 (Spring 1985). Strong policy considerations support the Commission and commentators who have concluded that method three is the best of the three alternatives in that it promotes "an equitable sharing of the loss between ratepayers and the utility stockholders." See Pierce, The Regulatory Treatment of Mistakes in Retrospect: Cancelled Plants and Excess Capacity, 132 U.Pa.L.Rev. 497, 558 (1984); Sommers, Recovery of Electric Utility Losses from *461 Abandoned Construction Projects, 8 Wm. Mitchell L.Rev. 363, 374 (1982). Method two, argued by the Attorney General, though initially placing the entire cost upon the shareholders, may actually in the long term be less favorable to the ratepayers than method three. The Attorney General conceded during oral argument that method two would allow the Commission to reevaluate CP & L's rate of return. As one commentator has noted:
[I]n the long run, consumers end up payingand paying twicebecause what they gain by "saving" cancellation costs, they lose in higher rates of return as well as in diminished utility stature in the capital markets.
Olsen, Statutes Prohibiting Cost Recovery for Cancelled Nuclear Power Plants: Constitutional? Pro-Consumer?, 28 Wash.U.J.Urb. & Contemp.L. 345, 377 (1985). On this record, the Commission's continued use of method three is within the Commission's discretion, and this Court will not disturb that decision. See, e.g., State ex rel. Utilities Comm. v. Public Staff, 323 N.C. 481, 374 S.E.2d 361; Utilities Commission v. Duke Power Co., 305 N.C. at 10, 287 S.E.2d at 791-92.
Based on our review of the whole record, we conclude that the Commission's order is supported by competent, material, and substantial evidence and is not erroneous as a matter of law in authorizing CP & L to continue to recover a portion of the cancellation costs of the abandoned Harris Plant as operating expenses through amortization.
In conclusion and for the reasons stated, we hold that the Commission did not err in this proceeding. Its order is, therefore,
AFFIRMED.
MARTIN, Justice, dissenting in part.
I cannot agree with the approval by the majority of the Commission's inclusion of the cost of the abandoned Units 2, 3 and 4 of the Shearon Harris nuclear plant as operating expenses under N.C.G.S. § 62-133. The law does not permit, for ratemaking purposes, a utility to earn a return on property not used or useful in rendering services to the public.
N.C.G.S. § 62-133(b) prescribes the formula which the Commission is required to follow in fixing rates for service to be charged by a public utility. The effect of the entire statute is to impose "used and useful" or "operational" limitations on plant costs, revenues and expenses. Therefore, allowable operating expenses must have a nexus with "used and useful" property. The abandoned units have no value. These cancelled nuclear units will never be "used and useful" in providing electrical service to the customers of CP & L.
Thus, the Attorney General is correct in his argument that only those costs associated with operational plants are to be considered expenses. The Commission, by including the costs of the abandoned units in its operating expenses, violates these statutory requirements. The costs of abandoned property, however prudently scheduled at the outset of the project, cannot be recovered under our statute. This may indeed produce a harsh result at times, but it is the result required under the law, the Commission having no equitable powers. The utility must look to resources other than the Commission in its efforts to recoup its losses.
This Court has so held in State ex rel Utilities Comm. v. Nantahala Power & Light Co., 313 N.C. 614, 332 S.E.2d 397 (1985), rev'd on other grounds, 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986), where we stated that only operating expenses incurred in the provision of service to consumers may be considered by the Commission in setting rates. To the same effect is our holding in State ex rel Utilities Comm. v. Carolina Utilities Customers Assoc., 314 N.C. 171, 333 S.E.2d 259 (1985). The majority recognizes this principle in footnote two where it states that operating expenses "include costs for fuel, wages and salaries, and maintenance, as well as annual depreciation charges and taxes." As the majority implicitly recognizes, capital expenses such as costs incurred by the abandonment of plants cannot *462 be properly charged as operating expenses.
Of course, the utility does not contend that the abandoned plant costs were for plant which is now "used and useful" in providing electric service. North Carolina does not recognize such property as "used and useful." See Utilities Comm. v. Telephone Co., 281 N.C. 318, 189 S.E.2d 705 (1972); Utilities Comm. v. Morgan, Attorney General, 278 N.C. 235, 179 S.E.2d 419 (1971). Nor can such capital expenditures be recovered through amortization as operating expenses incurred in rendering service to customers. In so doing the Commission acted beyond its statutory authority. This the Commission may not do.
These enormous expenses are not operating expenses under the statuterather, they are capital costs. Without legislative action, cancelled plant costs may not be correctly allowed as operating expenses. The Commission only has its statutory authority which may not be extended by inference for reasons of convenience or necessity.
There is clear authority for this line of reasoning based on decisions from other states. The first decision on this issue by a state's high court was by the Ohio Supreme Court which held that costs associated with abandoned plants could not be considered operating expenses. Office of Consumers' Counsel v. Public Utilities Commission, 67 Ohio St.2d 153, 423 N.E.2d 820 (1981), appeal dismissed sub nom., Cleveland Illuminating Co. v. Office of Consumer's Counsel, 455 U.S. 914, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982). Ohio's rate-making statutory scheme set forth in Ohio Rev. Code Ann. § 4909.15(D)(2)(b) is very similar to North Carolina's. The Wyoming Supreme Court clearly disallowed recovery of any costs of or return on abandoned plants, either in rate base or through operating expenses or through a statutory "other values of the system" provision of its public utilities code. Pacific Power and Light Co. v. Public Service Commission, 677 P.2d 799 (Wyo.), cert. denied, 469 U.S. 831, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984). See Wyo.Stat. § 37-2-119 (1977). In Citizen's Action Coalition of Indiana, Inc. v. Northern Indiana Public Service Company, 485 N.E.2d 610 (Ind.1985), cert. denied, 476 U.S. 1137, 106 S.Ct. 2239, 90 L.Ed.2d 687 (1986), the Indiana Supreme Court held that the costs of an abandoned nuclear project were not allowable, amortizable operating expenses since the abandoned plant was not "used and useful" property. The relevant Indiana statute required that charges by a public utility for any "service" rendered should be reasonable and just. Ind.Code § 8-1-2-4 (1988). The court reasoned that:
Any allowable operating expense must have a connection to the service rendered before it can be recovered through retail rates.
... This connection is established when the operating expense is incurred as a result of the process whereby existing "used and useful" property ... is employed to produce the product or commodity... or accommodation ... rate payers receive. For example, wages, salaries, fuel, maintenance plus annual charges for depreciation and operating taxes.
Citizen's Action Coalition, 485 N.E.2d at 614.
The majority recognizes that the Commission in the entry of its order was exercising what it perceived to be its equitable authority. The Commission has no equitable authority, but can only exercise such powers as are expressly delegated to it by the legislature. By using equitable principles in its order, the Commission arrived at the incongruous result of allowing the utility to recoup some, but not all, of its expenditures incurred by the abandonment of the nuclear units. Under the statute granting the Commission its authority, the utility was either entitled to recover all of these losses or none. I find that the Commission erred as a matter of law by including as operating expenses CP & L's costs of the abandoned Units 2, 3 and 4 of the Shearon Harris nuclear plant.
I am authorized to state that Justice MITCHELL joins in this dissenting opinion.
NOTES
[1] This unanimous order was entered by Commissioner Edward B. Hipp, presiding; and Commissioners Julius A. Wright and William W. Redman, Jr.
[2] In order to properly address each side's contentions on each of these issues, we think it is helpful to review the public utility ratemaking formula found in N.C.G.S. § 62-133. This statute requires the Commission to determine the utility's rate base (RB), its reasonable operating expenses (OE), and a fair rate of return on the company's capital investment (RR). These three components are then combined according to a formula which can be expressed as follows:

(RB × RR) + OE = REVENUE REQUIREMENTS
The rate base is the reasonable cost of the utility's property which is used and useful in providing service to the public, minus accumulated depreciation, and plus the reasonable cost of the investment in construction work in progress. See N.C.G.S. § 62-133(b)(4) (Cum. Supp.1988 & 1982 Repl.Vol.); C.F. Phillips, Jr., The Regulation of Public Utilities 332 (1984). Operating expenses generally include costs for fuel, wages and salaries, and maintenance, as well as annual depreciation charges and taxes. C.F. Phillips, Jr., The Regulation of Public Utilities 229 (1984). The rate of return is a percentage multiplier applied to the rate base to produce the amount of money the Commission concludes should be earned by the utility, over and above its reasonable operating expenses. See N.C.G.S. § 62-133(b)(4) (Cum.Supp.1988 & 1982 Repl.Vol.)
Per an exhibit of CP & L witness Paul S. Bradshaw, Vice President and Controller of CP & L, the Commission's order at issue in this proceeding allows CP & L to include $26,776,643 of unamortized Harris Plant abandonment costs in the OE component of the ratemaking formula.
[3] The Commission based this conclusion on several factors, including: this Court's liberal construction of operating expenses in Utilities Comm. v. Edmisten, Attorney General, 294 N.C. at 606, 242 S.E.2d at 868; the general purposes of the Public Utilities Act, as set forth in N.C. G.S. § 62-2; and, the observation, contrary to the Attorney General's position, that "[m]any reasonable operating expenses cannot be tied to specific utility property."
[4] Decisions upholding amortization of cancelled plant costs include Union Electric Co. v. Federal Energy Regulatory Commission, 668 F.2d 389 (8th Cir.1981); Gulf Power Co. v. Cresse, 410 So.2d 492 (Fla.1982); Central Maine Power Co. v. Public Utilities Commission, 433 A.2d 331 (Me. 1981); Attorney General v. Department of Public Utilities, 390 Mass. 208, 455 N.E.2d 414 (1983); State ex rel. Union Electric Co. v. Public Service Commission, 687 S.W.2d 162 (Mo.1985); Abrams v. Public Service Commission, 67 N.Y.2d 205, 492 N.E.2d 1193, 501 N.Y.S.2d 777 (1986); People's Organization for Washington Energy Resources v. Washington Utilities & Transportation Commission, 104 Wash.2d 798, 711 P.2d 319 (1985); Wisconsin Public Service Corp. v. Public Service Commission of Wisconsin, 109 Wis.2d 256, 325 N.W.2d 867 (1982); and Pacific Power & Light Co. v. Public Service Commission, 677 P.2d 799 (Wyo.), cert. denied, 469 U.S. 831, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984). Cases to the contrary are Citizens Action Coalition, Inc. v. Northern Indiana Public Service Co., 485 N.E.2d 610 (Ind.1985), appeal dismissed, 476 U.S. 1137, 90 L.Ed.2d 687 (1986); Appeal of Public Service Co. of New Hampshire, 125 N.H. 46, 480 A.2d 20 (1984); Office of Consumers' Counsel v. Public Utilities Commission, 67 Ohio St.2d 153, 423 N.E.2d 820 (1981), appeal dismissed sub nom., Cleveland Electric Illuminating Co. v. Office of Consumers' Counsel, 455 U.S. 914, 102 S.Ct. 1267, 71 L.Ed.2d 455 (1982); and Barasch v. Pennsylvania Public Utility Commission, 516 Pa. 142, 532 A.2d 325 (1987), aff'd sub nom., Dequesne Light Co. v. Barasch, 488 U.S. ___, 109 S.Ct. 609, 102 L.Ed.2d 646 (1989).